**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

———————————————————————

**SUSTAINABLE SHARK ALLIANCE**
**1025 Thomas Jefferson Street, NW**
**Suite 420 East**
**Washington, D.C.  20007,**

**OCHOA SEAFOOD ENTERPRISES, INC.**
**214 Huggins Ferry**
**Sugarland, TX  77479, and**

**VENICE SEAFOOD, LLC**
**140 Tante-Phine Rd. Box 207V**
**Venice, LA  70091,**

           **Plaintiffs,**

**v.**                            **Civ. No.**

**THE HONORABLE CARTER SMITH, in his**
**official capacity as the Executive Director of the**
**Texas Parks & Wildlife Department, and**

**THE HONORABLE KEN PAXTON, in his**
**official capacity as the Attorney General of the**
**State of Texas**

           **Defendants.**

———————————————————————

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### I.      INTRODUCTION

1.     In this civil action, the Sustainable Shark Alliance, Ochoa Seafood Enterprises, and

Venice Seafood, LLC (collectively, "Plaintiffs") seek to enjoin, as contrary to the Commerce and

Supremacy Clauses of the U.S. Constitution, the State of Texas from regulating lawful and

federally-regulated shark products in international commerce between, *inter alia*, Louisiana and

Mexico, as well as those in interstate commerce destined for Texas.  U.S. CONST. Art. 1, Sec. 8, Cl. 3; Art. VI, cl. 2.

2.      Specifically, Texas purports to require that a shark's fins be "naturally attached" to each shark carcass shipped from, to, or through the state.  Texas Parks & Wildlife Code ("TPWC") § 66.2161(c).  The only exception to this is for shark meat that "has been finally processed and delivered to the final destination or to a certified wholesale or retail dealer."[1]  *Id.* § 66.216(b).

3.      By contrast, federal law only requires that a shark's tail and fins remain naturally attached through the point of landing.  *See* 50 C.F.R. § 600.1203.  Perhaps more importantly, regulations issued under federal fisheries and shark conservation laws require those with federal dealer permits allowing the buying and selling sharks to "report [on a weekly basis] the total weight of the carcass(es) *without the fins* for each species, and the *total fin weight by grade* for all sharks combined" to the National Marine Fisheries Service ("NMFS").  *Id.* § 635.5(b)(1) (emphasis added).  As used in these regulations, the term "fins" includes the tail of a shark.  *See id.* § 635.30(c)(1).

4.      The provisions of Texas law at issue were part of a bill adopted by the Texas Legislature in 2015 and signed into law with an ostensible effective date of July 1, 2016 that was primarily focused on prohibiting the sale of shark fins in the state.  This suit does not challenge this aspect of the law.

5.      Application of this law to shark meat taken from sharks lawfully landed by fishermen in other states under state and/or federal permits, and sold, as required by federal law, to federally-licensed seafood dealers, has virtually shut down the shark fishery throughout the Gulf of Mexico.  This is because the vast majority of shark meat landed in states such as Louisiana—

---

[1]  Technically speaking, by its terms, this exemption applies only to the tail and not a shark's fins.

**Complaint for Injunctive and Declaratory Relief**                                    **Page 2**

the leading shark producing state—is exported by truck through this judicial district, and, for reasons explained below, Texas' enforcement of this provision has halted this trade. Mexico is one of largest, if not the largest, market for U.S. caught shark meat.

6.     The shipment prohibition was not discussed in the sole hearing held in the Legislature, nor does it further the purposes of the law's main goal of prohibiting the sale of shark fins in Texas. Rather, as explained below, requiring the fins to accompany the meat destined for sale in Texas means the fins of sharks – which can have substantial value – coming from other states must be "sold" to Texas processors even though they could not benefit from the fins economically.

7.     Thus, the purpose of the provision of law at issue appears to be designed to influence or regulate commerce in shark fins legally landed in other states.

8.     Therefore, this provision, as applied to shark fishing outside the State of Texas, directly regulates interstate and international commerce and favors in-state shark processors relative to processors in other states, each in violation of the Commerce Clause.

9.     Furthermore, the dramatic impacts on a federally-regulated fishery, which opened on January 1, 2019, in other states, including stopping virtually all shark fishing in Louisiana, far outweigh any putative benefits the shipment requirement may provide to Texas citizens. Indeed, while other states that bar sales of shark fins require the fins be destroyed or discarded at the dock, this provision encourages the importation of fins (albeit attached to shark carcasses) and guarantees that fins so imported into Texas, as well as those from sharks landed in state, will be dispersed to numerous processing locations across Texas. This would make the sales prohibition more difficult to enforce, as the presumption that a shark fin found at a location other than the point of first landing is unlawfully in trade could not be applied.

**Complaint for Injunctive and Declaratory Relief**                    **Page 3**

10.     Finally, it is difficult, if not impossible, for federally permitted shark fishermen and dealers to comply both with federal reporting regulations governing the shark fishery and the Texas law, as those regulations ask for separate reporting of shark carcasses and fins.

11.     For these reasons, and as detailed further below, Defendants are acting unlawfully in requiring that shark carcasses shipped into or through the state have their fins and tails naturally attached.

12.     Plaintiffs have suffered irreparable injury from the unlawful actions complained of herein and will continue to suffer injury if not addressed by this Court.

## II.     <u>PARTIES</u>

13.     Plaintiff Sustainable Shark Alliance ("SSA") is a non-profit, unincorporated trade association supported by contributions from federally-licensed shark fishermen, shark dealers, and fin processors that promotes their interests in legislative, regulatory, and legal forums.   The organization promotes responsible fishing practices, shark conservation, and realization of the full economic value from strictly limited allowable shark catches to support rural fishing communities on a sustained basis.   SSA and its participants have been and will continue to be harmed by the illegal actions complained of herein.

14.     Plaintiff Venice Seafood, LLC, is a fish house located in Venice, Louisiana, which is one of the leading purchasers of sharks in a state which leads all others in terms of the number of sharks landed.   The company is licensed by NMFS, an agency within the U.S. Department of Commerce with responsibility to administer federal fisheries laws, to purchase and sell sharks.   As such, Venice Seafood is required to provide a weekly report to NMFS with, *inter alia*, the weight, <u>without the fins attached</u>, of all sharks purchased both by species and in aggregate.   Also, as both Louisiana and federal law prohibit the complete removal of shark fins and tails on fishing vessels,

**Complaint for Injunctive and Declaratory Relief**                                              **Page 4**

that process must occur at the company's facility.  Venice Seafood purchases both the shark meat and the fins.  Some ninety percent of the shark meat, in the form of "logs" (the headed and gutted carcass with the fins removed), it buys is shipped to Mexico via Texas, while it sells the fins to a domestic purchaser for drying and export.  Since the State of Texas began enforcing the transportation restriction, the company has lost all sales to Mexico.  Venice Seafood has been and will continue to be harmed by the illegal actions complained of herein.

15.     Plaintiff Ochoa Seafood Enterprises, Inc. ("OSE"), is a Texas-based buyer and exporter of seafood products.  Fully sixty percent of its annual income is derived from the buying and selling of shark meat from dealers in Louisiana, Florida, and North Carolina.  One hundred percent of the shark meat bought by the Plaintiff is shipped by truck through Texas and sold in Mexico City.  OSE buys the meat in the form of "logs."  The company is not in the business of selling shark fins.  However, even if could buy sharks with their fins and tail attached, OSE would have to pay shark dealers for the value of those fins in addition to the meat to offset losses fish dealers would incur from not being able to sell the fins domestically.  Recouping these extra costs, which include higher shipping costs, could be difficult if not impossible with the low margins for these products.  Further, Plaintiff is concerned that shipping shark carcasses with the tail attached could degrade the quality of the shark meat.  OSE has been and will continue to be harmed by the illegal actions complained of herein.

16.     Defendant Carter Smith is the Executive Director of the Texas Parks & Wildlife Department ("TPWD" or "Department"), an agency of the State of Texas with responsibility for enforcing the law at issue in this this case.  Mr. Smith is sued solely in his official capacity as Executive Director of TPWD.

17.     Defendant Ken Paxton is the Attorney General of the State of Texas, who has the responsibility of enforcing and administering the laws of Texas, including the one at issue in this case.  Attorney General Paxton is sued solely in his capacity as Attorney General.

### III.     JURISDICTION AND VENUE

18.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for violations of civil rights under the Commerce Clause, Art. 1, Sec. 8, Cl. 3, and the Supremacy Clause, Art. VI, cl. 2, of the United States Constitution.

19.     This case also presents a federal question within this Court's jurisdiction under Article III, § 2 of the United States Constitution, and 28 U.S.C. §§ 1331 and 1343.

20.     Declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202.

21.     Venue lies in this Court pursuant to 28 U.S.C. § 1491(b)(2), as "a substantial part of the events or omissions giving rise to the claim" occurred in this District.

22.     An actual, justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

23.     Plaintiff SSA has associational standing to bring these claims because "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organizations' purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

### IV.     STATUTORY BACKGROUND

24.     The statute in question was adopted by the Texas State Legislature in 2015 and signed into law that year with an effective date of July 1, 2016.  *See* Acts 2015, 84th Leg., R.S.,

**Complaint for Injunctive and Declaratory Relief**                                              **Page 6**

Ch. 1254 (H.B. 1579).[2]  House Bill 1579, captioned as "AN ACT relating to the sale and purchase of shark fins or products derived from shark fins," amended and added to the Texas Parks and Wildlife Code.

25.     Relevant to this case, Section 1 of H.B. 1579 changed an exemption for sharks which allowed both the head and tail of a shark to be removed at sea, with the effect of disallowing the removal of shark tails.  With the change, Texas law prohibits the possession of a shark with "the tail removed unless the fish has been finally processed and delivered to the final destination or to a certified wholesale or retail dealer."  TPWC § 66.216(b).  This is one provision of the law at issue.

26.     Section 2 of the bill created a new statutory provision, TPWC § 66.2161. Subsection 66.2161(a) defines sharks as "any species of the subclass Elasmobranchii" and shark fins as the "detached fin or tail of a shark," in any form.  Subsection (b) prohibits the buying, selling, possession, or transportation (or offering for the same purposes) of shark fins wherever caught.

27.     Subsection (c) is the other provision at issue.  It provides, in full:

> A person may buy or offer to buy, sell or offer to sell, possess for the purpose of sale, transport, or ship for the purpose of sale, barter, or exchange a shark carcass that retains all of its fins naturally attached to the carcass through some portion of uncut skin.

TPWC § 66.2161(c).

28.     Subsection (d) allows the Department of Parks and Wildlife to issue permits to allow sale, transport, and possession of shark fins for scientific research purposes, while subsection

---

[2] The Bill's legislative history and text can be access at https://capitol.texas.gov/BillLookup/History.aspx?LegSess=84R&Bill=HB1579.

(e) allows a warden or officer to hold a shark fin for evidence whenever a person is charged with a violation of this section, so long as it is destroyed following a final ruling.

29.     Subsection (f) creates an exemption allowing only the legally permitted shark fishermen who lawfully harvested the shark to possess its fins.  This exemption allows only the person landing the shark to possess a shark fin, provided the fin is taken in a manner consistent with that person's license; the exemption does not allow shark dealers, or any persons who did not land the shark, to possess shark fins.  It thus creates ambiguity as non-exempt entities receiving shark carcasses with fins need to remove them as part of "final processing," and thus they will be "in possession" of the fins for at least some period of time without legal authorization.

30.     HB 1579 also added penalties for violating the new section 66.2161, contained a savings clause that applied the shark fin prohibition only to acts committed on or after the effective date of the law, and established an effective date of July 1, 2016.  HB 1579 § 3-5.

31.     The law applies to many of Plaintiff SSA's participants and the individual Plaintiffs, and therefore all face the real and imminent threat of criminal prosecution for engaging in any of the acts the law and regulations prohibit.  As such, there is an actual controversy between the parties within the meaning of the Declaratory Judgment Act.

## V.     FACTUAL BACKGROUND

## A.     INITIAL AWARENESS OF THE TEXAS LAW'S APPLICATION TO INTERNATIONAL COMMERCE

32.     While the law went into effect on July 1, 2016, Plaintiffs only became aware of Texas' intent to apply this provision to shark meat in international trade on or about July 10, 2018, when an officer with the TPWD contacted the owner of OSE, Mr. Gabriel Ochoa, regarding a shipment of sharks that had been subject to inspection by officials with the U.S. Food and Drug Administration at the McAllen, Texas boarder station on or about March 7, 2018.

33. That shipment was loaded on a refrigerated truck in Venice, Louisiana and was destined for Mexico City, Mexico.

34. That officer, Dean Fitzpatrick of the TPWD, informed this Plaintiff that he had seen a photograph of the shipment and noted that the shark carcasses in the truck did not have the tails and fins attached, as he claimed was required by Texas law. The officer asked questions about the sellers and destination of the cargo, which Mr. Ochoa declined to provide.

35. Mr. Ochoa retained an attorney to serve as his representative in dealing with this matter. That attorney and the Department had subsequent discussion. Ultimately, as of February 13, 2019, however, the TPWD has issued no citation or taken any further actions on the matter.

36. Concerned about the application of this law to its business, Plaintiff OSE has not bought any sharks or made any shipments of sharks from the U.S. to Mexico since having been contacted by the TPWD.

37. Rather, this Plaintiff inquired, through counsel, about the applicability of the provisions of TPWC § 66.2161 to sharks in international commerce from states other than Texas to Mexico that merely incidentally transited through Texas. General Counsel of TPWD confirmed the law applied to all sharks present in the state, even as part of a continuous stream of international commerce emanating from a state other than Texas.

38. This incident created a general awareness of the law at issue, which has impacted shark fishing throughout the Gulf of Mexico and beyond.

## B. THE GULF OF MEXICO AND ATLANTIC SHARK FISHERY AND INTERNATIONAL TRADE IN SHARK MEAT AND FINS

39. NMFS, an agency located in the U.S. Department of Commerce, has jurisdiction over the management of fisheries in federal waters granted under the authority of the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 *et seq.* NMFS

has jurisdiction over fisheries, fishery resources, and fishing activities within the United States' "exclusive economic zone" ("EEZ") beyond the waters under the jurisdiction of each state.  16 U.S.C. §§ 1802(11), 1811(a).  In general, the EEZ extends out to 200 miles from shore.  *See* Proclamation No. 5030, 48 Fed. Reg. 10605 (Mar. 10, 1983).

40.     After working with U.S. commercial fishermen and academics in the 1980s to help develop the shark fishery – primarily by encouraging domestic fishermen to find markets for the shark's meat – NMFS developed its first fishery management plan ("FMP") under the MSA to impose controls on shark fishing in waters of the Atlantic coast and Gulf of Mexico in 1993.  This management plan included overall caps on fishing for various sharks in order to address what the agency considered to be severe depletion in some shark populations.

41.     As part of its management of Atlantic and Gulf of Mexico sharks, NMFS instituted the first prohibition on "shark finning" – or the practice of cutting the fins off a shark and discarding the carcass at sea – in 1993.   58 Fed. Reg. 21931 (1993).  Subsequently, Congress passed a nationwide ban on shark finning in 2000.  Shark Finning Prohibition Act, Pub. L. No. 106-557, 114 STAT. 2772, 2772 (2000).   In 2010, Congress strengthened this prohibition by requiring that all sharks be landed with their tail and fins "naturally attached" to the carcass.  Shark Conservation Act of 2010, Pub. L. 111-348, § 103, 124 STAT. 3668 (2010) (codified as amended at 16 U.S.C. § 1857 (2011)).  Thus, the only processing that may now occur on a vessel at sea is the removal of head and guts.

42.     Among the elements of this FMP, fishermen wishing to participate in the shark fishery in federal waters must have a permit issued by NMFS.  50 C.F.R. § 635.4(e).  Furthermore, regardless of whether a shark is caught in federal or state waters, it may only be sold to a dealer that has a permit from NMFS allowing it to buy and sell sharks.  *Id.* §§ 635.4(g)(2).

**Complaint for Injunctive and Declaratory Relief**                                        **Page 10**

43.     Federally permitted dealers must submit weekly reports to NMFS identifying, *inter alia*, the weight, by species and in aggregate, of all sharks purchased.  *Id.* § 635.5(b)(1).  "For sharks, each report must specify the total weight of the carcass(es) *without the fins* for each species, and the *total fin weight* by grade for all sharks combined."  *Id.*  (emphasis added).  As such, federal law envisions the removal of a sharks fins by a federally licensed dealer at the point of first sale.

44.     Likewise, federally-permitted shark fishermen are also required to report to NMFS the weight of the shark meat and fins they sell to appropriately licensed dealers.  *Id.* §§ 635.5(a)(2), 635.30(c)(3).

45.     As used in these regulations, the term "fins" includes the tail of a shark.  *See id.* § 635.30(c)(1).

46.     The shark FMP has been modified several times since its introduction, strengthening protections for shark populations.  As a result of what many participants in the fishery consider to be overly conservative management, including very precautionary quotas and prohibitions on landing and selling of certain sharks, shark populations have increased significantly from their nadir in the 1990s.  Federal surveys of shark populations over time have found exponential growth of most species.  *See* NMFS, Apex Predator Program, Large Coastal Shark Survey 2018 (presentation at the Sept. 6, 2018 Highly Migratory Species Advisory Panel meeting), *available at* https://www.fisheries.noaa.gov/webdam/download/80234316 (last visited Fed. 13, 2019).

47.     As a result of this conservative management approach, the United Nations' Food and Agriculture Organization reported in 2017 that "of 16 global shark fisheries identified as biologically sustainable, 9 involve United States shark fishermen, accounting for 76.4% of total landings from these 16 fisheries."  UN FOA, Fisheries and Aquaculture Circ. No. 1076, *Review of*

*the Implementation of the International Plan of Action for the Conservation of Sharks*, at 64 (Rome 2017), *available at* http://www.fao.org/docrep/017/i3036e/i3036e.pdf (last visited Feb. 16, 2017).

48.     The shark fishery in the Gulf of Mexico opens on January 1 of each year, with quotas for different groups and species of large and small coastal sharks, as well as oceanic sharks.

49.     Typically, fishing would begin on January 1, as there are very few fisheries open to commercial fishermen at this time of year.

50.     In order to land a marketable product, shark fishermen have to make short trips and quickly remove as much blood from the animal as possible after catching it.  A shark's blood contains compounds that can quickly turn to ammonia and spoil the meat.  The best way to accomplish this is to remove the tail, which, as mentioned, is no longer allowed aboard a vessel.

51.     While there are methods that can be lawfully employed to remove a shark's blood aboard a vessel, it is a best practice to get the carcass quickly to a federally licensed dealer to complete processing (*i.e.*, removal of the tail and fins) to help guard against spoilage.

52.     Dealers purchasing the catch pay fishermen for the meat and fins.  Plaintiff Venice Seafood, which has a federal permit to buy sharks, sells the shark meat in the form of "logs," or headed and gutted form with the belly flaps, fins, and tails removed, to wholesalers such as OSE for export or to domestic wholesalers or processors for final processing into steaks and filets for retail and restaurant markets.  Some ninety percent of Venice Seafood's shark meat is exported to Mexico through this judicial district in the form of logs.

53.     The least costly way to ship shark meat from Louisiana, which lands the most sharks by volume, followed by Florida, and other states along the Atlantic and Gulf coasts, is by refrigerated truck through Texas to Mexico.  Marine transportation and airfreight are prohibitively

expensive, primarily because shark meat is a relatively low priced source of protein, and the profit margins for fishermen, fish dealers, and wholesalers are generally very narrow.

54.     For their part, the fins are either exported, generally to Asia and primarily Hong Kong, by the purchasing shark dealer in "wet" form (*i.e.*, unprocessed) or sold to a domestic fin buyer who dries and then exports the fins.  In general, Venice Seafood sells the fins it buys to a domestic fin wholesaler for further processing in the United States prior to export.

55.     The fact that profit margins for shark fishermen and dealers are low makes it very important that they be able to obtain the best possible price for their meat and fin products.

56.     Further, because shark fins can comprise up to half the total value of an individual large shark, the income from the fins is extremely important to fishermen.  Shark fishermen have many fixed costs such as insurance and vessel mortgages, and variable costs incurred in fishing, such as for fuel and crew shares, which need to be recovered.

57.     For all the reasons described above—including federal regulations, importance for maintaining fresh meat quality for shelf life, and market factors—it is important, even required, to remove a sharks' fins and tails immediately upon landing.

58.     Finally, the federal interest in the shark trade extends beyond NMFS' jurisdiction over shark fishing.  For instance, in order to export the shark meat, or logs, a wholesaler and shipper such as OSE must obtain both an Export Health Certificate and a Certificate of Origin from the U.S. Department of Commerce.  The FDA has jurisdiction over shark meat and fins in commerce.  Also, some species of sharks may only be exported with appropriate permits issued by the U.S. Fish and Wildlife Service, an agency within the U.S. Department of the Interior.

**Complaint for Injunctive and Declaratory Relief**                              **Page 13**

**C.      IMPACT OF THE TEXAS LAW ON PLAINTIFFS, INTERSTATE, AND INTERNATIONAL COMMERCE**

59.      As mentioned, Plaintiff OSE has not engaged in any buying or selling of shark meat since being informed that the business practice of shipping shark logs ostensibly contravenes the Texas statute at issue, which has had a significant adverse impact on the company.

60.      Since being contacted by TPWD about its shipment, OSE has a reasonable basis to fear being fined and possibly incarcerated if it were to ship shark meat through Texas without the fins or tails attached, and it has no reasonable alternative shipping route or method.

61.      Even if this Plaintiff could buy sharks with the tails and fins attached given the federal regulations described above, it will take time to develop a market for those fins and logistical challenges and additional shipping costs may render such an operation unprofitable.

62.      Plaintiff Venice Seafood has bought no sharks to date this year even though the fishing season for sharks in the Gulf of Mexico opened up on January 1.  For reference, Venice Seafood had purchased 55 metric tons of sharks by the end of January 2018.

63.      This Plaintiff has informed the fishermen who sell sharks to the company that it cannot sell, and therefore cannot buy, sharks to wholesalers such as Plaintiff OSE because of the uncertainty they face due to application of the Texas law to shipments in international commerce. As a result, those fishermen have lost an important source of winter income this year.

64.      Venice Seafood is also stymied by (1) the fact that the federal government requires shark carcass and fin weight be separately reported, which is best done by removing the tails and fins, and (2) the ostensible requirements of Texas that the fins and tail remain attached.  The company is thus at jeopardy from legal action by two different sovereigns.

65.     Both OSE and Venice Seafood are also reasonably concerned that shipping shark carcasses with tails attached may degrade the quality of the meat, which would damage their reputation for quality in the industry

66.     Plaintiff SSA represents shark fishermen, fish house, and shark fin processors throughout the Atlantic and Gulf coastal regions who are impacted by the Texas law.

67.     For example, some of its participating dealers in Florida sell shark meat to Texas. Those dealers now face the same dilemma as that faced by Plaintiff Venice Seafood.  Additionally, the halt to exports to Mexico of shark meat has adversely impacted fishermen and fish houses along both of these coasts because Mexico is a large market, if not the primary market, for all shark meat landed in the U.S.

68.     Finally, SSA's participants who buy shark fins from federally-permitted shark dealers or otherwise export fins are also injured because very few sharks have been landed due to the uncertainty surrounding the applicability and legality of the Texas law at issue.

69.     Further, even if dealers could sell sharks with the fins attached, shipping them in them in this manner to Mexico or Texas (where they have no economic value) would divert the majority of fins lawfully landed in the U.S. away from domestic fin processors and sellers in states other than Texas.  Because Louisiana is the leading state in terms of the volume of shark landings, Texas' law threatens the viability of these businesses, including those who participate in SSA.

70.     The impacts of Texas law on interstate and international commerce have been dramatic.  For reference, last year, more than 170 metric tons of sharks had been landed in the Western Gulf of Mexico between January 1, 2018 and February 8, 2018; over the same period this year less than 16 metric tons of sharks have been landed, a decline of more than ninety percent. *See* NMFS, Atlantic Highly Migratory Species Division, Atlantic Shark Commercial Fishery

Landings and Retention Limit Update from January 1—February 8, 2019, *available at* https://content.govdelivery.com/accounts/_USNOAAFISHERIES/bulletins/22fa466 (last visited Feb. 13, 2018).

71.     The Texas law has entirely or nearly entirely ended trade of shark meat between the U.S. and Mexico and between other states and Texas.

**D.     THE TEXAS LAW FAVORS IN-STATE ECONOMIC INTERESTS, PROVIDES NO PUTATIVE BENEFITS TO TEXANS TO OUTWEIGH THE BURDENS ON INTERSTATE AND INTERNATIONAL COMMERCE, AND IS PREEMPTED BY FEDERAL LAW**

72.     The Texas law regulating the form in which shark carcasses are shipped favors in-state economic interests over those located out of state and provides no benefit to the citizens of Texas that outweighs the burdens on interstate and international commerce mentioned above.

73.     As to the first, this requirement makes shark meat provided by Texas shark fishermen less expensive relative to the price of shark meat that could be provided by out of state dealers.  This is primarily because shark dealers in states such as Louisiana, Florida, and North Carolina can otherwise sell the fins, which comprise a significant part of a shark's overall value. To sell to the Texas market, out-of-state dealers must receive a price for a carcass with the fins attached comparable to what they would be paid for the fins and meat if they were sold separately. Practically speaking, Texas has all but closed its market to shark meat from other states.

74.     As to the second, the shark transportation law provides no benefit to the citizens of Texas.  There is no added enforcement benefit from requiring fins from sharks landed in Texas be shipped to processors in other parts of the state.  Indeed, by not simply requiring the destruction of fins at the dock, as do other states with similar bans, the Texas law requires fins to be dispersed across the state, to sites where final processing occurs.  Logically, this compounds enforcement

**Complaint for Injunctive and Declaratory Relief**                              **Page 16**

challenges as officials must ensure that shark fins at several locations across the state beyond the dock are not put into commerce.

75.     Parenthetically, the requirement to ship the fins to Texas processors creates an internal inconsistency in the law.  Specifically, once the processor removes the fins for processing, that processor would then technically be "in possession" of the fins, whereas the law only creates an exemption for possession by the fishermen who legally caught the shark.  *See* TPWC § 66.2161(f).  At the very least, the requirement that those receiving shark carcasses only do so with the fins attached means that Texas law enforcement officials cannot apply the same presumption available to those in states that require destruction at the dock that fins in the hands of processors are held for unlawful purposes.

76.     There appears to be little justification for this provision other than to regulate the shark fishery in other states, as it has had the effect of doing.  By its simple operation, this provision ensures that more shark fins either enter in Texas, attached to carcasses sold into the state, or transported through Texas.  Neither result is consistent with a ban on the sale of shark fins by Texas residents.

77.     Even if the provision did not interfere with interstate and international commerce in an unconstitutional manner, which it does, the Texas law is preempted by a comprehensive federal system of managing shark harvesting, retailing, trade, and export.

78.     Most specifically, it is preempted, *inter alia*, by the requirement that federally permitted shark dealers, to whom all sharks landed in the United States for commercial purposes must be sold, provide separate weights for the shark carcasses and fins, which can most effectively be done by separating the two at the point of landing.   This is just part of an overall scheme of regulation of all aspects of the shark fishery and trade in shark products.

**Complaint for Injunctive and Declaratory Relief** **Page 17**

**E.      CONCLUSION**

79.      In sum, Defendants have exceeded their authority under the United States Constitution by purporting to regulate the trade in shark fins and meat in other states, between other states and Texas, and between the United States and Mexico.

80.      For these reasons and others, Plaintiffs have been harmed and will continue to be harmed by the Defendants' illegal actions.

## CLAIMS FOR RELIEF

### COUNT ONE
**(Declaratory Judgment Act, 42 U.S.C. § 1983, United States Constitution)**

81.      Plaintiffs allege paragraphs 1 through 80 as if they were set forth in full herein.

82.      The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that in cases of an actual controversy, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

83.      The Constitution of the United States, Article I, Section 8, clause 3 grants Congress the authority to "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. CONST. Art. I, § 8, cl. 3.

84.      The Texas statute at issue violates the Commerce Clause of the U.S. Constitution because, among other reasons, it favors in-state interests over their competitors in the shark fishery in other states; it directly regulates interstate and foreign commerce; and because its impact on interstate and foreign commerce far exceeds any putative benefits it may have for the citizens of Texas.

### COUNT TWO
**(Declaratory Judgment Act, 42 U.S.C. § 1983, United States Constitution)**

85.      Plaintiffs allege paragraphs 1 through 84 as if they were set forth in full herein.

86.     The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that in cases of an actual controversy, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

87.     The Constitution of the United States, Article VI, paragraph 2 states:   "This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."   U.S. CONST. Art. VI, ¶ 2.

88.     In regulations adopted under the authority of the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.*, and the Shark Conservation Act of 2010, Pub. L. 111-348, among others, NMFS has promulgated regulations which require not only the sale of all sharks landed in the United States to persons holding a federal shark dealer's permit, but also that those dealers report to the agency, on a weekly basis, "the total weight of the carcass(es) without the fins for each species, and the total fin weight by grade for all sharks combined." 50 C.F.R. § 635.5(b)(1).

89.     As such, fish dealers possessing federal permits to buy sharks, if not outright required to separately weigh shark carcasses and shark fins by federal law, are at the very least prevented by the provisions at issue from acting in accordance with practices sanctioned by the regulations duly promulgated to implement federal law.  As such, there is a conflict between the Texas law and federal law to which the state law must yield.  Also, the federal government has a comprehensive system for regulating shark fishing, processing, and trade that leaves no room for Texas to regulate shark transportation in the manner provided for under the provisions at issue.

**Complaint for Injunctive and Declaratory Relief**                                    **Page 19**

## COUNT THREE
### (Declaratory Judgment Act, 42 U.S.C. § 1983, United States Constitution)

90.     Plaintiffs allege paragraphs 1 through 89 as if they were set forth in full herein.

91.     The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that in cases of an actual controversy, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

92.     Plaintiffs and Plaintiff SSA's participants face a real and imminent threat of criminal prosecution and civil enforcement for transporting any finless shark carcass landed and processed in accordance with federal law into Texas in interstate commerce or through Texas as part of continuous transportation in international commerce.

93.     Further, the enforcement of these unconstitutional provisions of law has disrupted the federal Atlantic and Gulf shark fishery, as well as shark fisheries in state waters of states other than Texas.  Texas' unlawful actions have had adverse impacts on shark fishermen, wholesale seafood dealers, fin processors, and exporters of shark products through the Gulf and Atlantic regions.  Participants in these lawful and federally regulated activities are being forced to either conform their operations to fit with Texas' processing requirements or to forgo access to two of the major markets for shark meat, *i.e.*, Texas and Mexico.

94.     Thus, because an actual controversy exists, Plaintiffs request this Court declare that the Texas law, insofar as it purports to require the retention of shark fins and tails on shark carcasses in interstate and international commerce, is null and void and without effect.

### <u>PRAYERS FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully seek an Order of this Court:

(a)     Declaring, pursuant to the Declaratory Judgment Act, 28 U.S.C.  § 2201, that the Texas law at issue is null and void to the extent it applies to shark carcasses in interstate and international commerce for, among others, the reasons stated above;

(b)        Declaring, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that Defendants lack legal authority to regulate interstate or international transportation or commerce in federally regulated shark species;

(c)        Enjoining Defendants from applying the unlawful provisions to shark species in interstate and international commerce;

(d)        Vacating the unlawful portions of the law at issue;

(e)        Awarding Plaintiffs their costs and attorneys' fees as appropriate;

(f)        Providing such other relief as is just and proper.

Dated:  February 19, 2019          Respectfully submitted,

/s/ *Fabio Dworschak*
Fabio Dworschak
Attorney-In-Charge
Federal ID No. 3136513
State Bar No. 24098694
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd., Suite 900
Houston, Texas 77027
Telephone:  (713) 355-5000
Facsimile:  (713) 355-5001
E-mail:  FDworschak@kelleydrye.com

OF COUNSEL:

/s/ *Shaun M. Gehan*
Shaun M.  Gehan
D.C.  Bar No.  483720
**Application for Admittance pending**

THE LAW OFFICE OF SHAUN M. GEHAN, PLLC
1025 Thomas Jefferson St. NW –Suite 420-East
Washington, D.C.  20007
Telephone: (202) 412-2508
E-mail:  sgehan@gehanlaw.com
*Attorneys for Plaintiffs*